# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-61826-CIV-ROSENBAUM

BARBARA LAWSON,

     Plaintiff,

vs.

PLANTATION GENERAL HOSPITAL, L.P.,

     Defendant,

_____/

## ORDER

This matter is before the Court upon Defendant's Motion for Summary Judgment ("Motion for Summary Judgment"). [D.E. 31, 32].   The Court has carefully considered the Motion, Defendant's Statement of Undisputed Material Facts [D.E. 33], Plaintiff's Opposition to the Motion for Summary Judgment [D.E. 48], Plaintiff's Statement of Material Facts in Dispute [D.E. 49], and Defendant's Reply [D.E. 57], as well as the attached exhibits, deposition transcripts, and affidavits of various witnesses in this case.  After a full review, the Court finds that Defendant's Motion for Summary Judgment should be granted in part and denied in part.

## *BACKGROUND*

On November 12, 2008, Defendant Plantation General Hospital, L.P., ("Defendant")[1] filed its Notice of Removal [D.E. 1] with the Court.  In its Notice, Defendant indicated that Plaintiff Barbara Lawson ("Plaintiff" or "Lawson"), had filed an action in the Circuit Court of the Seventeenth Judicial Circuit.  Defendant asserted that this Court has original jurisdiction over the action pursuant to 28 U.S.C. § 1331 because the Complaint sets forth facts which, if true, would

---

[1]    Defendant is the owner and operator of Plantation General Hospital (the "Hospital").

constitute a violation of federal law. Indeed, the Complaint alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e-2, *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*, the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.* The Complaint also sets forth various claims under the Florida Civil Rights Act ("FCRA") stemming from allegations of discrimination due to Plaintiff's race, age, handicap, national origin, and gender.

Plaintiff is a Black Jamaican female who suffers from sickle cell disease[2] and who was formerly employed by Defendant as an executive secretary in the Administrative Offices of the Hospital. Plaintiff claims that following a sickle cell crisis that required hospitalization and then bed rest, Defendant involuntarily transferred Plaintiff to another position in the Hospital – as Medical Staff Administrative Assistant. Plaintiff contends that the transfer constituted a demotion and asserts that a less qualified, younger Hispanic male, Miguel Cruz, was promoted to her former executive secretary position. Following this transfer and an allegedly unfair evaluation of Plaintiff, Defendant terminated Plaintiff's employment. Plaintiff contends that Defendant's actions were discriminatory and were made in retaliation for Plaintiff's taking of FMLA leave. Defendant responds that it did not discriminate or retaliate against Plaintiff and that it had legitimate non-discriminatory and non-retaliatory reasons for its actions. Defendant also emphasizes that Plaintiff's termination was based upon a reduction in force ("RIF").

---

[2]     Sickle cell disease is an inherited blood disorder that affects the blood cells. People with sickle cell disease have red blood cells that contain mostly hemoglobin*S, an abnormal type of hemoglobin. Sometimes the red blood cells become sickle-shaped and block small blood vessels, causing less blood to reach that part of the body. Tissue that does not receive normal blood flow eventually becomes damaged. *See* www.sicklecelldisease.org

### MATERIAL FACTS[3]

The Court notes that it must take the facts in the light most favorable to Plaintiff,[4] but sets forth the events from each party's perspective so that it may establish a complete picture of the parties' positions.  Plaintiff is a Black female of Jamaican descent who suffers from sickle cell disease and who was fifty-eight years old at the time of the filing of the Motion for Summary Judgment.  In September of 1995, Defendant hired Plaintiff to work as an executive secretary in the Hospital's  Administrative Offices, where she worked with the Chief Executive Officer ("CEO"), the Chief Operations Officer ("COO"), and the Chief Financial Officer ("CFO").  Plaintiff served as the Hospital's Executive Secretary in Administration until February of 2007, when the Hospital transferred Plaintiff to its Medical Staff Office.  When Plaintiff first began serving as the Executive Secretary in Administration, she reported to Pat Johnsen ("Johnsen"), Administrative Assistant to the CEO.  Sometime after 1997, Plaintiff began reporting to David Hughes ("Hughes"), who was the CFO at the time.

After Hughes left the Hospital in December of 2005, Elizabeth Izquierdo ("Izquierdo"), a younger Hispanic female, became the Hospital's new CFO.  From late 2005 until late January of 2007, Plaintiff worked directly for Izquierdo and indirectly for the COO, Shana Sappington ("Sappington").  At that time, Johnsen also worked in the Administrative Office with Plaintiff, where Johnsen served as an administrative assistant to Sappington and the CEO Barbara Simmons

---

[3]    The Court has set forth the material facts based upon its review and consideration of Defendant's Statement of Undisputed Material Facts [D.E. 33], Plaintiff's Statement of Disputed Material Facts [D.E. 49], and affidavits and deposition transcripts of the various witnesses in this case, including any attached exhibits.  The Court further notes that pursuant to Local Rule 7.5.D, all material facts set forth in Defendant's statement and supported by evidence of record are deemed admitted unless controverted by Plaintiff's statement.

[4]    *See Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002).

3

("Simmons").  Thus, the Administrative Office was comprised of Izquierdo, Sappinton, Simmons, and their two support staff – Plaintiff and Johnsen.

In her role as Executive Secretary in Administration, Plaintiff performed administrative duties for committees that were chaired by the CFO.  Although Plaintiff assisted with other committees, the Ethics and Compliance Committee accounted for approximately 25% of Plaintiff's work.  Plaintiff also answered phones, scheduled meetings, filed, and performed clerical tasks, among other work.[5]  Plaintiff received consistently good performance reviews as well as pay raises each year that she performed her duties as Executive Secretary in Administration.

As noted previously, Plaintiff suffers from sickle cell disease, a permanent condition with which she was first diagnosed in 1972.  Plaintiff asserts that sickle cell disease is a qualifying disability under the ADA and FCRA or, alternatively, that Defendant knew about the condition and perceived the disease to be a disability, or that she had a record of disability.  Defendant disagrees that Plaintiff's sickle cell disease qualifies her as disabled under the ADA and FCRA.  During Plaintiff's twelve years of employment at the Hospital, Plaintiff suffered at least five major sickle cell crises – in 1998, 2002, 2003, 2004, and 2006.[6]  All of the crises required hospitalization, during which Plaintiff received oxygen and pain medication, followed by bed rest.  In addition to these crises, Plaintiff experienced non-major crises that required bed rest and prescription medication.

---

[5]    As noted in the Hospital's Position Description for Executive Secretary, Lawson served "as the primary source of administrative and clerical support for the assigned executive hospital position, under the general administrative guidance of the Administrative Assistant." The goals of the position included efficient scheduling of meetings and appointments; effective communication with colleagues, doctors, staff, and patients; following up with department managers on the status of projects; preparing written correspondence; managing and simplifying the flow of documents; and the effective management of schedules and priorities.

[6]    The Hospital (including Izquierdo) was aware that Plaintiff suffers from sickle cell disease.

4

Plaintiff states that she receives ongoing treatment for her sickle cell disease. Plaintiff takes folic acid and multiple vitamins on a daily basis for her sickle cell disease, and her primary care physician, Dr. Richard McClean ("McClean"), prescribed Darvocet for Plaintiff to take when she feels a sickle cell crisis coming on. Plaintiff also asserts that she has been prescribed Plavix, HCT2 (hydroshlorothiazide), Amlodipine for hypertension, Metaprolol for angina, and Protonix for hiatial hernia. Many of Plaintiff's conditions are complications of her sickle cell disease.

Plaintiff has a treating hematologist, Dr. Jolly Varki ("Dr. Varki"), whom Plaintiff sees approximately every six months. Although Dr. Varki's records reflect extended periods of time during which Plaintiff is without significant symptoms, the records also reveal that Plaintiff suffers weakness, weight loss, and shortness of breath. Plaintiff indicates that she experiences joint/muscle weakness and fatigue on a daily basis. Plaintiff also states that she suffers from chronic anemia, her gall bladder has been removed, and she has a heart murmur, gout, an enlarged spleen, and elevated bilirubin, which she asserts are all complications of sickle cell disease. Plaintiff also notes that she had a stroke and continues to suffer from hypertension. In connection with her sickle cell disease, Plaintiff indicates that she must avoid stress, cannot engage in extreme physical activity such as running, and is not able to care for herself when she has a major crisis. Defendant, on the other hand, emphasizes that Plaintiff can care for herself, perform daily tasks, and work on a full time basis.

Plaintiff's last major sickle cell crisis occurred in December of 2006, when she worked for Izquierdo. During this major crisis, Plaintiff was hospitalized for ten days and then ordered to bed rest for an additional period of time before returning to work on January 15, 2007. As a result of the major crisis, Plaintiff requested and was granted FMLA leave. Plaintiff claims that this is the only time that she officially applied for FMLA leave, but Defendant asserts that Plaintiff has never been

5

denied request for time off as a result of her illness.  Both parties agree that Plaintiff has been able to work since her return to work on January 15, 2007, through April 2, 2009 (the date of her deposition).

Following Plaintiff's FMLA leave in December of 2006, she returned to her position as Executive Secretary in Administration on January 15, 2007.  According to Plaintiff, within days of returning to work, Izquierdo transferred Plaintiff to another unit in the Hospital.  Hospital documents reflect that effective February 4, 2007, Plaintiff was transferred from Executive Secretary in Administration to a new position as Administrative Assistant in the Hospital's Medical Staff Office.  At the same time, Miguel Cruz ("Cruz"), a younger Hispanic male, was transferred from Administrative Assistant in the Medical Staff Office to Executive Secretary in Administration.  Defendant claims, however, that Plaintiff's Executive Secretary position was eliminated and when Cruz transferred into Administration, a new position was created which included Plaintiff's former job responsibilities and the additional responsibility of handling physician contracts.

Defendant asserts that Plaintiff's transfer was based on legitimate business reasons.  According to CFO Izquierdo, her duties included, among other things, auditing various physician contracts.  Prior to Izquierdo's appointment as CFO, the physician contracts were handled by Plaintiff's co-worker Johnsen.  After Izquiredo became the CFO, however, Cruz handled this task as part of his duties as Administrative Assistant in the Medical Staff Office.  Izquierdo began working on the physician contracts with Cruz while he was assigned to Medical Staff and, although she was satisfied with Cruz's work on the contracts, Izquierdo claims that she wanted the contracts to be handled directly in the Hospital's Administrative Offices.  Accordingly, at a weekly Administrative Staff Meeting, Izquierdo proposed that Cruz be transferred into Administration as an Executive Secretary who would also handle physician contracts and that Plaintiff be transferred

6

in his place to the Medical Staff Office as an Administrative Assistant. Simmons, the acting CEO,

approved the decision to transfer both Plaintiff and Cruz. Izquierdo admits that she never considered

whether Plaintiff could perform the physician contract work.[7]

Hospital documents reflect that, upon his transfer to the Executive Secretary position, Cruz

received a merit raise and promotion. Specifically, Cruz received over a 10% pay increase once the

transfer became final. Upon her transfer, Plaintiff retained the same pay, benefits, and schedule as

when she was an Executive Secretary, but her title changed to Administrative Assistant.[8] In her new

position, Plaintiff kept her administrative responsibilities for the Ethics and Compliance Committee,

but not for other committees with which she had previously worked. According to Plaintiff, the

duties of the Executive Secretary in Administration required more analytical and interpretive skills,

writing, speaking, and interpersonal skills such that a transfer from Administration to another

department was perceived as a demotion. Defendant disagrees with Plaintiff's contention.

Following Plaintiff's transfer to the Medical Staff Office, she reported to Laurie Rodriguez

("Rodriguez"), the manager of the Medical Staff Office who, in turn, reported to Laurie Meyer

("Meyer"), the director of Medical Staff and Health Information Services. Meyer reported directly

to Izquierdo. Other employees in the Medical Staff unit included Marisel Grana ("Grana"), the

credentials coordinator, and Laurie Evans ("Evans"), a part-time medical staff coordinator who was

hired after Plaintiff's transfer. The parties do not dispute that Plaintiff was not happy with the

---

[7]    Plaintiff contends that earlier in her career at the Hospital, she handled physician
contracts, including preparing and auditing the contracts.

[8]    As noted in the Hospital's Position Description for Administrative Assistant in
Medical Staff, "the position provides administrative support to [the] Director." The Assistant
also performs clerical tasks and coordinates department functions. The position includes the
"primary responsibility for ordering supplies, office filing system, daily correspondence and
communications."

transfer.

In March of 2007, just after her transfer, Plaintiff received her annual evaluation for the calendar year of 2006, which reflected Plaintiff's performance as Executive Secretary. Although the evaluation was prepared by Izquierdo and Sappington, Izquierdo had been out on maternity leave from May of 2006 through August or September of 2006, and in her absence, Sappington served as Plaintiff's supervisor. The March, 2007, evaluation indicated that Plaintiff had performed well in her role as Executive Secretary. The parties agree that Plaintiff received a pay increase shortly thereafter, but Defendant contends that the raise was made in connection with the March, 2007, evaluation, and Plaintiff claims that the pay increase resulted from an adjustment in the range of her pay by Human Resources.

Plaintiff worked in her new role in Medical Staff from early February of 2007 until she was terminated nine months later on October 19, 2007. Although the parties do not dispute this fact, they do debate greatly Plaintiff's job function while in Medical Staff. Defendant contends that Plaintiff's duties were essentially the same as before her transfer – she provided administrative support to the office, performed clerical tasks, ordered supplies, filed, and handled correspondence and communications. In this regard, Defendant emphasizes that Plaintiff continued to perform her administrative responsibilities for the Hospital's Ethics and Compliance Committee.

Plaintiff, on the other hand, asserts that she spent the majority of her time filing in Medical Staff and did not prepare correspondence as she had done in Administration. And, although Plaintiff acknowledges that she continued to work on the Ethics and Compliance Committee, she states that she no longer performed administrative duties for the other committees with which she had previously worked.

In early July of 2007, Rodriguez and Meyer met with Plaintiff and presented her with a 90-

Day Evaluation ("the Evaluation") with respect to her performance in the Medical Staff Office. The Evaluation indicated that Plaintiff met expectations in many areas, but also rated Plaintiff as inconsistent in other areas. For example, one of the criticisms listed in the Evaluation stated that Plaintiff showed an unwillingness to assist Izquierdo in completing meeting minutes for the Ethics and Compliance Committee. According to Plaintiff, the inclusion of this criticism reveals that Meyer consulted with Izquierdo prior to issuing the Evaluation. At this time, Rodriguez and Meyer provided Plaintiff with a Performance Improvement Plan ("PIP") that set forth the areas in which Plaintiff needed to improve and asked Plaintiff to prepare a response that would map out Plaintiff's plan to address each area of perceived deficiency. Plaintiff felt that the evaluation and PIP were unfair, not reflective of her job performance, and completely contrary to all other evaluations she had received while employed at the Hospital. Plaintiff also emphasizes that during this same time frame, Rodriguez told Plaintiff that Rodriguez was asked to "find stuff to write about [Plaintiff]."

Plaintiff drafted and submitted various versions of her response to the PIP, with the first two responses being deemed insufficient. Indeed, after Plaintiff submitted her first response, the Vice President of Human Resources, Ben Bittner ("Bittner"), met with Plaintiff to discuss the PIP and Plaintiff's response. During the meeting, at which Rodriguez and Meyer were also present, Bittner asked Plaintiff to go back and attempt to further develop her response. Sensing Plaintiff's frustration with her new position and performance evaluation, as an alternative to continuing her employment in the Medical Staff unit, Bittner offered Plaintiff a severance package. Plaintiff, however, responded that she did not wish to accept a severance package. Subsequently, Plaintiff drafted a revision to her response, which was also deemed unsatisfactory, but then provided a final response to the PIP dated August 23, 2007, which Bittner deemed to be sufficient. After Plaintiff submitted her final response, her supervisors noted that Plaintiff's performance had improved.

9

Less than two months later, on October 19, 2007, Defendant terminated Plaintiff's employment, at which time Bittner explained to Plaintiff that her position had been eliminated as a result of a reduction in force ("RIF"). Defendant set Plaintiff's effective date of termination as November 2, 2007, which allowed Plaintiff to enjoy the continuation of benefits through the end of November. Plaintiff also received twelve weeks of severance pay.

Although the parties agree that Plaintiff's employment was terminated, they dispute the reasons for the termination. Defendant claims that in the fall of 2007, the Hospital's East Florida Division Office directed the CEO, CFO, and COO to reduce its workforce by either five or six full-time employees. Izquierdo stated that this reduction was necessitated by budgetary concerns and a drop in patient census. According to Defendant, the Administration (Izquierdo, Sappington, and Simmons) reviewed each department to determine which was over-staffed or under-staffed, and then the Administration met with Bittner to discuss each individual identified for termination. The team determined that Plaintiff's duties in Medical Staff could be allocated to the other two employees in that unit (*i.e.*, Grana and Evans). Defendant asserts that both Grana and Evans were capable of carrying out the clerical duties of Plaintiff's position, but that Plaintiff had not been trained in the job functions of Grana and Evans's positions; hence, her position could be eliminated. Defendant contends that Plaintiff's position was eliminated, that no one replaced her, and that no other positions in the office were available at the time of her elimination.

Plaintiff disputes that her termination resulted from a RIF and asserts that the reason given by Defendant was a pretext for discrimination and retaliation. Plaintiff points to the fact that four other individuals were terminated along with Plaintiff and that three of the five employees were Black and none were Hispanic. Additionally, Plaintiff emphasizes that four of the five individuals terminated were substantially over the age of forty, and four had taken FMLA leave more than once

within the prior two years.  Also significant to Plaintiff is the fact that those who allegedly took over Plaintiff's duties (Grana and Evans) are non-Black employees who are substantially younger than Plaintiff.

Plaintiff further notes that the utilization reports upon which  Defendant claimed it relied to impose the RIF, do not support the elimination of Plaintiff's position because the reports reveal that Medical Staff was not over-staffed.  Instead, Plaintiff notes that the September 30, 2007, report reveals that while the target hours for the department were 618 hours, the actual hours used amounted to only 595.25.  Likewise, the utilization report for October 31, 2007, shows that the target hours for Medical Staff was 662.40 and the actual hours used totaled 589.75.  Plaintiff also emphasizes that the November, 2007, utilization report shows that the target hours of Medical Staff were lowered to 457.60 hours, while the target hours for other departments with reduced positions remained approximately the same.  Plaintiff further states that at the time that her position was eliminated, the Hospital was hiring for other positions, but Plaintiff was not offered another position. Finally, although Cruz later resigned his employment with the Hospital in December of 2007 (two months after Plaintiff's termination) and Defendant advertised the Executive Secretary position as vacant, it did not contact Plaintiff to fill the position.

## *ANALYSIS*

### A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original).  An issue is

genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if "it would affect the outcome of the suit under the governing law . . . ." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

Following a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party, and resolves all reasonable doubts against the movant. *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009). Further, the Court will not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007). Thus, upon discovering a genuine dispute, the Court promptly will deny summary judgment. *Id.*

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

12

B.      The *McDonnell Douglas* **Burden Shifting Analysis**

Here, where no direct evidence[9] of discrimination exists, Plaintiff may establish her *prima facie* claims of discrimination and retaliation through circumstantial evidence. In evaluating whether a plaintiff has set forth a *prima facie* case of discrimination or retaliation through the use of circumstantial evidence, the Eleventh Circuit has applied the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff must first demonstrate a *prima facie* case of discrimination or retaliation, which creates a presumption that the employer discriminated or retaliated against her. *Curtis v. Broward County*, 292 F. App'x 882, 883 (11th Cir. 2008) (citing *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006)); *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997).

Where the plaintiff establishes a *prima facie* case of discrimination or retaliation, the burden shifts to the defendant to come forward with evidence of a legitimate, non-discriminatory (or non-retaliatory) reason for the challenged adverse employment action, which rebuts the presumption of discrimination (or retaliation). *Id.* at 1564, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citing *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)); *Brown*

---

[9]     The Eleventh Circuit has held that direct evidence of discrimination is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Kilpatrick v. Tyson Foods, Inc.*, 268 F. App'x 860, 861-62 (11th Cir. 2008). Such direct evidence reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee," and must indicate that the adverse employment decision was motivated by the decision-maker's intent to discriminate. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109 (2000) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)). As a result, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence." *Kilpatrick*, 268 F. App'x at 862.

13

*v. Chertoff*, 563 F. Supp. 2d 1372, 1378 (S.D. Ga. 2008).  If the defendant meets this burden of production, the burden then shifts back to the plaintiff to establish that the defendant's proffered reasons are merely pretext for the employer's discriminatory and retaliatory actions.  *Id.*  In other words, Plaintiff must come forward with evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons" for the employment action. *Perrero v. Spectacor Mgmt. Group*, 308 F. App'x 327, 329 (11th Cir. 2009) (quoting *Chapman v. A.I. Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)).

**C.      Plaintiff's FMLA Retaliation Claim**

_____The FMLA provides an eligible employee up to a total of  twelve weeks of unpaid leave in any one-year period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a); *Parris v. Miami Herald Publishing Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000).  The FMLA creates two types of claims: interference claims, in which the employee asserts that his employer denied or otherwise interfered with his substantive rights, and retaliation claims, in which the employee contends that her employer discriminated against her because she engaged in a protected activity.  29 U.S.C. § 2615(a)(1) and (2); *Martin v. Brevard County Public Schools*, 543 F.3d 1261 (11th Cir. 2008); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006); *Wascura v. City of South Miami*, 257 F.3d 1238 (11th Cir. 2001).

In her Complaint, Plaintiff asserts only a claim for FMLA retaliation.  To successfully make a claim for FMLA retaliation, Plaintiff must demonstrate the following:  (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.  *Martin*, 543

14

F.3d at 1268; *Hurlbert*, 439 F.3d at 1297.  Where Plaintiff establishes a retaliation case without direct evidence of the employer's retaliatory intent, the burden-shifting framework set forth in *McDonnell Douglas* applies.  *Martin*, 543 F.3d at 1268.

In this case, no dispute exists that Plaintiff engaged in statutorily protected activity by taking medical leave pursuant to the FMLA.  Hence, Defendant concedes for purposes of its Motion for Summary Judgment that the first prong of Plaintiff's *prima facie* case is met.  Defendant claims that Plaintiff's retaliation claim fails, however, because Plaintiff cannot show that she suffered an adverse employment action and cannot demonstrate a causal connection between any alleged adverse employment action and her medical leave.

### 1.    Adverse Employment Action

Defendant argues that Plaintiff's transfer to the Medical Staff Office was not an adverse action because the job reassignment was not material and significant, but rather, was a lateral transfer.  According to Defendant, Plaintiff's position in Medical Staff was virtually the same as her prior job as an Executive Secretary in Administration.  Defendant emphasizes that Plaintiff retained the same pay, benefits, schedule, and hours.  Plaintiff also retained her responsibilities with respect to the Hospital's Ethics and Compliance Committee.  Defendant argues that transfers are not considered materially adverse where the plaintiff produces no objective evidence to support a loss of prestige.  Because Plaintiff cannot show an adverse employment action, Defendant contends that Plaintiff's retaliation claim must fail.

Plaintiff disagrees and contends that a genuine issue of material fact exists regarding whether Plaintiff's transfer constituted a demotion or adverse employment action.  In this respect, Plaintiff points out that Cruz's transfer from Medical Staff to Executive Secretary in Administration came

15

with a considerable raise, and the Hospital referred to the transfer as a "promotion."  Additionally, Plaintiff argues that reassignment of job duties can be considered an adverse employment action when the new responsibilities fall within the same job description.  In support of this position, Plaintiff cites to *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998), in which the Eleventh Circuit stated, "Where a plaintiff has allegedly suffered termination, demotion, reduction in pay, loss of prestige, or diminishment in responsibilities . . . a court normally has no cause to consider its standard for adversity; the relevant question is whether such potentially adverse actions took place."  Based on *Doe*, Plaintiff asserts that a genuine issue of material fact exists as to whether Plaintiff suffered a loss of prestige or diminishment of responsibilities sufficient to constitute an adverse employment action.  According to Plaintiff, a perception at the Hospital existed that being transferred from Administration to another department was a demotion and that Plaintiff's prior duties in Administration required more skill than her new Medical Staff position.  Finally, Plaintiff emphasizes that although the Hospital allowed her to continue her work with the Ethics and Compliance Committee, she had also been previously responsible for the administration of other committees.

The Court finds that a genuine issue of material fact exists as to whether Plaintiff's transfer from Administration to Medical Staff constitutes an adverse employment action.  Eleventh Circuit precedent makes it clear that acts other than 'ultimate employment actions" (*i.e.*, termination) may constitute adverse employment actions.  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (citing demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations as examples of adverse employment actions).  As noted by both parties, reassignment of job duties is not automatically actionable, but depends instead upon the

16

circumstances of the particular case and "should be judged from the perspective of a reasonable person in plaintiff's position, considering 'all the circumstances.'" *Burlington v. Northern and Santa Fe Railway Co v. White*, 548 U.S. 53, 71 (2006) (citations omitted).

Here, a reasonable person in Plaintiff's position could regard the transfer as adverse. Although Plaintiff did not suffer a reduction in pay and her work assignment was similar to that of her prior position, it was not the same. Indeed, Plaintiff testified during her deposition that she devoted approximately 25 percent of her time to the Ethics and Compliance Committee when she was in Administration, and yet when she transferred to Medical Staff, she spent about 15 percent of her time in this role. Plaintiff also emphasized that Ethics and Compliance was just one of the committees that she handled. Overall, the committees to which she devoted her time in Administration comprised about 80 percent of her work duties. Although Defendant notes that Plaintiff continued to work with the Ethics and Compliance Committee, it fails to acknowledge that her work with other committees did not follow Plaintiff to her new position. It appears that Plaintiff's role with respect to the administration of various committees changed dramatically when it went from 80% of her work duties to 15%.

This case differs significantly from *Polite v. Dougherty County School System*, 314 Fed. App'x 180 (11th Cir. 2008), a case in which a teacher was transferred to a different school after complaining about alleged discriminatory hiring practices. In *Polite*, the Court found that the plaintiff suffered no adverse employment action because his teaching job after the transfer involved the same responsibilities and the same pay. *Id.* at 183-184. Although Defendant likens the facts of *Polite* to this case, the Court disagrees. As noted above, Plaintiff did not retain all of her responsibilities after her transfer to Medical Staff. At a minimum, Plaintiff stopped working with

17

many of the committees on which she had worked previously.  Plaintiff's role also changed in that she no longer worked with the executives in Administration.  These facts distinguish this case from *Polite*.

Additionally, the Court notes that Cruz received a pay raise when he transferred into Administration.  Significantly, the Hospital regarded Cruz's change in position as a "promotion," as noted on his transfer form.  In its Motion for Summary Judgment, Defendant argues that transfers are not materially adverse where a plaintiff produces no objective evidence to support a loss of prestige argument.  Further, Defendant contends that although Plaintiff may have subjectively believed that she was transferred to a less prestigious position, this belief alone fails to meet the reasonable person standard set forth in *Burlington*.  While the Court agrees that Plaintiff's belief alone may not meet the reasonable person standard set forth in *Burlington*, the Hospital's view of Cruz's transfer as a "promotion" provides support for Plaintiff's argument that the position in Administration was regarded by the Hospital as a more desirable position.  And, as the Supreme Court recognized in *Burlington,* an adverse action may exist where a transfer occurs and a plaintiff's prior job was more prestigious.  *Burlington*, 548 U.S. at 71-72.

The Court also agrees with Plaintiff that *Deprado v. City of Miami*, 264 Fed. App'x 769 (11th Cir. 2008), cited by Defendant, is distinguishable from the facts of this case.  In *Deprado*, a police officer claimed that the city retaliated by transferring him to a different unit after he had engaged in activity protected by the First Amendment.  The Court found that the transfer did not amount to an adverse action because the plaintiff "offered no evidence that the Patrol Unit position was more arduous or required more qualifications, or that anyone besides [plaintiff] objectively considered it a better job."  *Id.* at 772.  In contrast, the instant matter involves a situation where there is evidence

that the Hospital itself regarded the transfer to Administration as a promotion. Thus, evidence exists in this case that suggests that someone besides Plaintiff considered her prior job to be more prestigious. For these reasons, the Court finds that a genuine issue of material fact exists as to whether Plaintiff's transfer from Administration to Medical Staff constitutes an adverse action.

Moreover, although the parties do not emphasize it in their briefs, the Hospital ultimately terminated Plaintiff's employment. Obviously, this constitutes an adverse employment action.

### 2.    Causal Connection

Defendant next contends that Plaintiff's retaliation claim must fail because, even assuming that an adverse employment action took place, no causal connection exists between the protected activity (*i.e.*, the FMLA leave) and the adverse action. In this regard, Defendant points out that Plaintiff's termination occurred nine months after her FMLA leave ended, which was eight months after her transfer to Medical Staff. Defendant asserts that this lapse of time is too great to allow an inference of unlawful retaliation. Consequently, Defendant seeks for the Court to enter summary judgment against Plaintiff on her retaliation claim because she cannot show a close temporal proximity between the protected activity and the adverse action.

Plaintiff, on the other hand, argues that close temporal proximity is not the only way to prove causation in a retaliation case. In this matter, Plaintiff points to additional evidence such as the fact that other employees who had taken FMLA leave were terminated at the same time as Plaintiff. Additionally, Plaintiff asserts that her FMLA leave and termination are temporally connected by a chain of intervening retaliatory acts such that a causal connection is established. For instance, Plaintiff emphasizes that she returned from FMLA leave on January 15, 2007, and her transfer to Medical Staff became effective on February 4, 2007 – a mere two weeks later. Next, at her three-

month performance review, Plaintiff received unfavorable comments in several areas of her new position.  Plaintiff's supervisors then sought for Plaintiff to file a response to the PIP, requiring Plaintiff to compose several drafts indicating how Plaintiff intended to correct her allegedly insufficient job performance. These drafts were submitted over time until a final draft was accepted. Moreover, Plaintiff indicated that during this same time frame, Rodriguez confided in Plaintiff that Rodriguez was asked to "find stuff to write about Plaintiff."  Finally, in late August of 2007, Bittner accepted Plaintiff's PIP.  Ultimately, however, in October of 2007, Defendant terminated Plaintiff based on the advice of Izquierdo and the Administrative team.  According to Plaintiff, all of these events provide sufficient indicia of a causal connection.

Despite the fact that a jury may ultimately agree with Defendant, the Court concludes that there is a genuine issue of material fact regarding whether a causal connection exists between Plaintiff's FMLA leave and her transfer and then termination.  Although Defendant denies a causal connection, the Eleventh Circuit has established that the causal link element is to be construed broadly.  In this regard, a plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington*, 261 F.3d at 1266. (citing *Olmstead*, 141 F.3d at 1460 (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).  Put another way, the causal connection prong requires Plaintiff to show that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Curtis v. Broward County*, 292 Fed. App'x 882, 885 (11th Cir. 2008) (citations omitted).

With respect to Plaintiff's selection for transfer to Medical Staff, the temporal proximity to her protected activity is significant.  Indeed, Plaintiff's transfer to the unit occurred only two weeks

20

after she returned to the Hospital from her FMLA leave.  Eleventh Circuit case law has made it clear that close temporal proximity between the protected activity and the adverse action may suffice to establish a causal connection.  *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1119; *Curtis*, 292 F. App'x at 885 (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  Where a plaintiff seeks to establish a causal connection through temporal proximity, the temporal proximity must be 'very close[.]'" *Curtis*, 292 F. App'x at 885 (quoting *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  Here, the temporal proximity is extremely close.

Likewise, the decision to terminate Plaintiff's employment at the Hospital presents similar questions of fact that must be resolved by a jury, particularly when those facts are viewed in the light most favorable to Plaintiff.  As noted by Plaintiff, other events occurred between the transfer and the termination that could be construed as evidence of a causal link.  *See Wideman*, 141 F.3d at 1455 (listing a series of adverse events after that occurred after plaintiff filed EEOC charge).  During Plaintiff's three-month review, Plaintiff received numerous negative remarks on her performance evaluation, whereas in her prior twelve-year tenure with the Hospital, Plaintiff had received positive evaluations.  Additionally, after Plaintiff received the negative performance evaluation, Bittner told Plaintiff that if she was unhappy with the transfer, she could simply accept a severance package and leave the Hospital.  Both of these actions could be seen as an attempt by the Hospital to force Plaintiff out.  This is true particularly in light of Rodriguez's alleged comment that she was asked to "find stuff to write about Plaintiff."

Moreover, when asked to, Plaintiff prepared a number of responses to the PIP, with the first few being rejected by Bittner.  It was only when Plaintiff submitted her last response in August of

2007, that she was deemed to have complied with Bittner's request.  Finally, it is undisputed that other employees terminated at the same time as Plaintiff had taken FMLA leave on more than one occasion during the two years prior to their termination.  Although the Hospital has come forth with other reasons for these employees' termination, the Court must take these facts in the light most favorable to Plaintiff.  For all of the reasons set forth herein, the Court declines to find that no genuine issue of fact exists as to whether Plaintiff can show a causal connection between her FMLA leave and her termination.  The Court is aware that Defendant has cited to *Clark* in support of its argument in favor of summary judgment, but this is simply not a case where Plaintiff relies merely on the timing of Defendant's actions.

In sum, because the Court finds that material issues of fact exist as to whether there is a causal connection between Plaintiff's FMLA leave, her selection for transfer to Medical Staff and her ultimate termination, Defendant's Motion for Summary Judgment must be denied.  Taking the facts in the light most favorable to Plaintiff, a jury could find that Plaintiff has successfully established a *prima facie* case of retaliation.  Indeed, the Court notes the relatively low threshold necessary to demonstrate the causal connection element of a *prima facie* case of retaliation and finds that a reasonable jury could conclude that the protected activity and the adverse action were not wholly unrelated.  Accordingly, under *McDonnell Douglas* and its progeny, the burden shifts to Defendant to set forth a legitimate, non-retaliatory reason for its alleged adverse employment actions. *See* Section F *infra*.

## D.      Establishing a *Prima Facie* Case of Disability Discrimination

### 1.      Applicability of ADAAA

The parties dispute the applicable standard for Plaintiff's disability claims.  While Plaintiff

asserts that the January 1, 2009, amendments to the ADA (referred to as the "ADAAA") apply to Plaintiff's case, Defendant contends that the ADAAA does not apply retroactively and, therefore, does not govern this case.  After careful review, the Court agrees with Defendant that the ADAAA does not apply to Plaintiff because her claims stem from acts that occurred prior to January 1, 2009.

Due to the absence of congressional intent to give the amendments retroactive effect, courts addressing the issue have held that the ADAAA does not apply retroactively.  Plaintiff is correct, however, that the Eleventh Circuit has not determined whether the ADAAA applies retroactively.  In *Shannon v. Potter*, 2009 WL 1598442, at *2 n. 5 (11th Cir. June 9, 2009), while finding it unnecessary to address the question, the court noted the lack of Eleventh Circuit published opinion on the issue.  Prior to the *Shannon* decision, however, in another unpublished *per curium* decision, the Eleventh Circuit suggested that the ADAAA does not apply retroactively.  *Fikes v. Wal-Mart, Inc.*, 322 F. App'x 882, 883 n.1 (11th Cir. 2009).  In *Fikes*, the court, in a footnote, stated,

> Plaintiff makes no argument that the amendments should apply retroactively; and absent Congressional expression to the contrary, a presumption against retroactive application applies when the new legislation would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.  *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S. Ct. 1483, 1505, 128 L. Ed. 2d 229 (1994).  So, we look to the ADA as it was in effect at the time of the alleged discrimination.

*Id.* at 883, n.1.[10]

Likewise, other Courts have held that the ADAAA should not be applied retroactively.  *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565-66 (6th Cir. 2009); *Kieswetter v.*

---

[10]    Because *Fikes* is an unpublished opinion, it is not binding on this Court and, instead, is only persuasive authority.  *Baker v. Birmingham Board of Education*, 531 F.3d 1336, 1338 (11th Cir. 2008).

*Caterpillar, Inc.*, 295 F. App'x 850, 851 (7th Cir. 2008); *EEOC v. Agro Distr., LLC,* 555 F.3d 462, 469 n.8 (5th Cir. 2009).   Indeed, the Fifth Circuit determined in a published opinion that the amendments contained in the ADAAA "do not apply retroactively."  *Id*.  Similarly, the Sixth Circuit in a published opinion, discussed the applicability of the ADAAA.  Specifically, in *Milholland v. Sumner County Bd. of Educ*, 569 F.3d 562 (6th Cir. 2009), the court found that the ADAAA did not govern the case because "its application would have the type of impermissibly retroactive effect that requires a clearly-stated congressional intent."  *Id.* at 565.  The Sixth Circuit noted that the conduct at issue in the case occurred before the ADAAA became effective and, "Congress did not 'expressly prescribe []' whether the statute should reach back to cover this conduct."  *Id.* at 566 (quoting *Landgraf* , 511 U.S. at 273).  Although the court recognized that Congress enacted the ADAAA to reinstate a broad scope of protection to be available under the ADA, it found that Congress's intent to "restore" protections "does not by itself, reveal whether Congress intends the [ADAAA] to apply retroactively."  *Id.* (citations omitted).  Finally, the court noted that the ADAAA, if applied retroactively, "attaches new legal consequences to events completed before its enactment" and, therefore, concluded that the ADAAA does not apply retroactively to pre-amendment conduct.  *Id.* at 567.

Additionally, as noted by Defendant, the EEOC's Notice of Proposed Rulemaking under the ADAAA (dated September 29, 2009) states that the EEOC takes the position that "[t]he ADAAA does not apply retroactively."  The Notice further explains that the ADAAA would not apply to a situation in which an employer allegedly failed to hire, terminated, or denied a reasonable accommodation to someone with a disability as late as December of 2008.  *See* http://eeoc.gov/policy/docs/qanda_adaaa_nprm.html.

In contrast, as noted by Plaintiff, the Ninth Circuit in *Rohr v. Salt River Project Agricultural Imp. & Power Dist*, 555 F.3d 850, 853 (9th Cir. 2009), relied upon the ADAAA in its analysis in a reversal of summary judgment in favor of the employer. The *Rohr* court discussed the ADAAA because it shed light on Congress's original intent when Congress enacted the ADA, but *Rohr* did not expressly decide whether the ADAAA applied retroactively to the plaintiff's claims. *Id*. at 853.

Plaintiff also relies on an unpublished Sixth Circuit decision decided prior to *Milholland*, in which the court concluded that the ADAAA applied retroactively to claims that seek prospective relief. *Jenkins v. National Bd. of Medical Examiners*, 2009 WL 331638 at *1 (6th Cir. Feb. 11, 2009). In *Jenkins*, a medical student sought additional time on a licensing examination as an accommodation for a diagnosed reading disorder. *Id.* at *1. The district court found that the plaintiff did not qualify as disabled under the ADA, but the Sixth Circuit, on appeal, remanded that case for further consideration in light of the ADAAA because the appeal was pending when the ADAAA became effective. *Id.* Because the case involved prospective relief and was pending when the amendments became effective, the Court found that the ADAAA must be applied. *Id.*

The Court finds that *Rohr* and *Jenkins* are not applicable to the facts of this case. First, the Ninth Circuit in *Rohr* did not decide the issue of whether the ADAAA applies retroactively. Second, although the Court in *Jenkins* concluded that it would apply the ADAAA retroactively, the holding is limited to the facts of that case – where the plaintiff's claims sought prospective injunctive relief (*i.e.*, an accommodation on a test that would occur in the future). Indeed, the court in *Jenkins* acknowledged that because the plaintiff sought prospective relief, no injustice would result from applying the ADAAA. *Id.* In the instant case, Plaintiff does not seek relief for an event that has not yet happened and, therefore, the reasoning of *Jenkins* does not apply to this case.

Based on the foregoing, the Court will follow the principle set forth in *Agro, Milholland,* and

*Fikes* that the ADAAA does not apply retroactively.  Accordingly, the Court will analyze Plaintiff's

disability claim under the ADA.

### 2.    The ADA and FCRA Claims for Disability Discrimination

Counts II and III allege claims under the FCRA[11] and ADA for disability discrimination

relating to Plaintiff's sickle cell disease.   The ADA[12] prohibits covered employers from

discriminating "against a qualified individual with a disability because of the disability of such

individual in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a); *Earl v. Mervyns, Inc.*, 207 F.3d 1361; 1365 (11th Cir. 2000).

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the

elimination of discrimination against individuals with disabilities." *Harris v. H&W Contracting Co.*,

102 F.3d 516 (11th Cir. 1996).

To assert a claim for disability discrimination  successfully, Plaintiff must demonstrate that

(1) she has a disability; (2) she is a "qualified individual" for the position; and (3) Defendant

unlawfully discriminated against her because of the disability.  42 U.S.C. §§ 12112(a); *Raytheon Co.

v. Hernandez*, 540 U.S. 44, 49 n. 3, (2003); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-

26 (11th Cir. 2005).   A plaintiff must also show that the employer has actual or constructive

---

[11]    Federal law interpreting the ADA is applicable to claims arising under the FCRA and, thus, the Court analyzes the claims together.  *Holly v. Clairson Indus., L.L.C.,* 492 F.3d 1247, 1255 (11th Cir. 2007); *Garavito v. City of Tampa*, 640 F. Supp. 2d 1374 (M.D.Fla. 2009).

[12]    Because the ADA is based on the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*, courts rely on cases decided under the Act to interpret similar language in the ADA.  *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

knowledge of the disability or considered the employee to be disabled.  *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996).  As with a claim for retaliation, if Plaintiff can establish a *prima facie* case, the burden then shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Raytheon*, 540 U.S. at 49 n.3; *Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999).  If the employer is able to meet its burden of production, the employee may still prevail on her claims if she can demonstrate that the employer's reason is pretextual.  *Id.*  Here, Defendant asserts that it is entitled to summary judgment because Plaintiff cannot establish that she has a disability under the ADA.

### a.      Is Plaintiff Disabled under the ADA?

A person is considered to be disabled under the ADA if he or she has "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. 12102(2); *Harris v. H&W Contracting Co.*, 102 F.3d 516 (11th Cir. 1996).  A plaintiff is deemed to be "disabled" for ADA purposes if he or she satisfies any one of these three definitions. *Gordon*, 100 F.3d at 911.  Considering whether a person is disabled under subsection (A) involves three steps.  First, the Court considers whether the individual suffers from an impairment.  *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).  Next, the Court must identify the life activity upon which the plaintiff relies and then determine whether it constitutes a major life activity under the ADA.  *Id.* Finally, the Court determines whether the impairment "substantially" limits the major life activity. *Id.*

With respect to the first step, the ADA does not define "impairment," but courts have sought guidance from the EEOC regulations commenting on Title I of the ADA.  These regulations provide

that a "physical impairment" is any "physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic, and lymphatic, skin and endocrine." 29 C.F.R. § 1630.2(h)(1). Although Defendant disputes that Plaintiff is "disabled" for purposes of her ADA claim, Defendant does not appear to contest that Plaintiff suffers from an impairment.[13] Instead, Defendant argues that Plaintiff's sickle cell disease does not substantially limit a major life activity. In this regard, Defendant emphasizes that "[a] physical impairment, standing alone . . . is not necessarily a disability as contemplated by the ADA." *Gordon*, 100 F.3d at 911. (citations omitted). Instead, the ADA requires that the impairment limit one or more of the individual's major life activities. *Id.*

**b.     Substantial Limitation of a Major Life Activity**

The determination of whether a person is disabled is made on a case-by-case basis and "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999), *superceded by statute*. With this in mind, the Court reviews how Plaintiff's sickle cell disease affects her life, particularly any of her "major life activities."

The ADA does not define the phrase "major life activity," but EEOC regulations explain that they include basic activities that the average person in the general population can perform with little or no difficulty. 29 C.F. R. § 1630.2(i). Major life activities include functions such as "caring for

---

[13]     Indeed, Plaintiff's sickle cell disease fits under the regulation's definition of "physical impairment" because it is a physiological condition affecting the hemic system.

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *D'Angelo*, 422 F.3d at 1226-27. Although the list provides examples of major life activities, it is not exhaustive. *See Bragdon,* 524 U.S. at 638. Here, it is not exactly clear which "major life activity" Plaintiff asserts has been substantially limited by her sickle cell disease, but, it appears that Plaintiff intends to assert the major life activity of caring for herself (and possibly working).[14] Although, in its Motion for Summary Judgment, Defendant asserts that Plaintiff failed to identify any major life activity affected by her illness, in its Reply, it acknowledges that in Plaintiff's Statement of Disputed Facts, she contends that she is not able to care for herself. Plaintiff's Statement of Disputed Facts references her deposition testimony in which she answered in the affirmative when asked "do you have any limitations on your ability to care for yourself or function on a daily basis as a result of being afflicted with this disease?" *See* Pltff depo at p. 48. Accordingly, taking the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has identified the major life activity of caring for herself as being substantially limited by her sickle cell disease.

Defendant contends that sickle cell disease varies widely from individual to individual and, while Defendant appears to recognize that Plaintiff suffers from major sickle cell crises, Defendant emphasizes that these crises are intermittent. Indeed, Defendant points out that only occasionally does Plaintiff experience the onset of a major crisis that requires hospitalization and medication. As

---

[14] With respect to the major life activity of working, "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i) (1997); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226-27 (11th Cir. 1999).

noted by Defendant, in her twelve-year tenure with the Hospital, Plaintiff suffered from major crises in 1998, 2002, 2003, 2004, and 2006 – approximately once every two years.  Defendant also states that in the absence of a major crisis, the only two activities affected by Plaintiff's illness are Plaintiff's involvement in stressful activities and her ability to engage in extreme activities such as running.  Of further significance, Defendant notes that Plaintiff has never claimed that she cannot work except in the rare instance of a major crisis.  Because Plaintiff was capable of working full time, Defendant argues that Plaintiff does not meet the ADA's definition of "disabled" even though Plaintiff's illness required intermittent hospitalization.  Likewise, Defendant contends that Plaintiff's ability to care for herself is not substantially limited when Plaintiff's sickle cell disease presents a major crisis for a few weeks every two years or so.

In conducting its analysis of whether Plaintiff is substantially limited in her major life activity of caring for herself, the Court notes that the phrase "substantially limits" means that Plaintiff is "unable to perform a major life activity that the average person in the general population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. §§ 1630.2(i) (1997).  When determining whether a disability qualifies as a substantial limitation of a major life activity, the Court considers "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2); *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1358-59 (S.D. Fla. 1999) (citing *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996))).

To rebut Defendant's arguments, Plaintiff cites to various cases asserting that the episodic and somewhat intermittent nature of her sickle cell crises does not prevent her from being disabled under the ADA.  First, Plaintiff cites to *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995), to emphasize that often the "disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather than the underlying impairment." In *Vande Zande*, the Court found that the plaintiff's episodic pressure ulcers (resulting from a tumor on her spinal cord) were part of her disability.

Likewise, Plaintiff cites to *EEOC v. Chevron Phillips Chemical Co.*, 570 F.3d 606, 618 (5th Cir. 2009), in support of her argument that relapsing conditions can constitute ADA disabilities, depending on the nature of each individual case.  In *Chevron*, the Fifth Circuit noted that conditions such as multiple sclerosis, epilepsy, and colitis, even though episodic in nature, can constitute disabilities.  *Id.*  Thus, the court found that a reasonable jury could conclude that the plaintiff was disabled due to chronic fatigue syndrome ("CFS") because she was substantially limited in the major life activities of caring for herself, sleeping, and thinking, even though the expected duration of the plaintiff's disability was indefinite and unknowable.  *Id.* at 620.

Most significantly, the Sixth Circuit in *Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775 (6th Cir. 1998), found that the plaintiff raised a genuine issue of material fact regarding whether her chronic pustular psoriasis substantially limited the major life activities of being able to care for herself and to work.  The plaintiff in *Cehrs* was able to work without incident until she suffered a flare-up of her psoriasis, during which time the plaintiff was unable to work for approximately two-and-one-half months.  *Id.* at 778.  Although the plaintiff had not suffered a similar flare-up in eight years and the defendant argued that the plaintiff was "disabled" only during

31

flare-ups, the court found that summary judgment was precluded where an issue of fact remained regarding whether plaintiff's psoriasis substantially limited her major life activities. *Id.* at 781. In announcing its decision, the court looked at the fact that no cure for psoriasis exists, plaintiff's type of psoriasis was severe, and even during the dormant stage of the impairment, the plaintiff experienced pain. *Id.* Additionally, the court noted that the plaintiff received weekly medication and treatment, even when her psoriasis was dormant. *Id.*

Defendant, in its Reply, distinguishes Plaintiff's cases and argues that they do not support Plaintiff's argument in opposition to Defendant's Motion for Summary Judgment. First, Defendant states that the issue in *Vande Zande* was not whether the plaintiff was disabled, but rather, whether her employer was required to accommodate an episodic symptom of the plaintiff's paralysis. Next, Defendant argues that the test applied in *Chevron* weighs in favor of Defendant, not Plaintiff. Defendant points out that the court in *Chevron* stated that the relevant time frame for assessing the existence of a disability is the time of the adverse employment action. Because the *Chevron* plaintiff suffered from CFS at the time of her discharge, her claim was not denied on summary judgment. Finally, Defendant distinguishes *Cehrs* by emphasizing that although the plaintiff suffered from intermittent flare-ups of psoriasis, she was also limited in caring for herself between flare-ups due to pain.

Although the Court appreciates Defendant's efforts to distinguish Plaintiff's cases, it finds that the overlying message of the case law is clear: the episodic nature of Plaintiff's sickle cell crises do not necessarily preclude her from establishing a disability under the ADA. With respect to the timing of the adverse action, at least with respect to Plaintiff's transfer, Plaintiff had recently returned to work after having been hospitalized for a significant amount of time. Moreover, just as

32

the plaintiff in *Cehrs* experienced symptoms between flare-ups, the record before the Court establishes that Plaintiff suffers from fatigue and muscle weakness on a permanent and long-term basis. In this respect, the timing of the adverse action is significant because Plaintiff's transfer to Medical Staff occurred shortly after her return from FMLA leave.

Looking to the factors set forth in 29 C.F.R. § 1630.2(j), the Court notes that Plaintiff states that she suffers from fatigue and muscle weakness that limit her on a daily basis, compared to the average person. In addition to suffering from major crises, Plaintiff states that she experiences non-major crises more frequently between major crises. According to Plaintiff's deposition testimony, when she suffers a non-major crisis, she has to stop what she is doing, take prescription medication, and rest in bed. Plaintiff testified that she has had to leave work early when she has endured a non-major crisis and has had to avoid stress and extreme physical activity.

The permanent nature of Plaintiff's sickle cell disease is also significant. Indeed, Plaintiff's sickle cell disease was detected in 1972 and, because the disease is not curable at this time, it is expected to remain with her for her entire life. And, although she may suffer from major crises relatively infrequently, it is virtually certain that Plaintiff will experience such crises for the rest of her life. As it was with the plaintiff in *Cehrs,* the psychological impact of knowing that a major crisis can strike at any time is significant. Finally, due to the nature of sickle cell disease, when Plaintiff encounters a major crisis, she is hospitalized, given oxygen and pain medication, followed by bed rest, and she is otherwise unable to care for herself. The expected duration of Plaintiff's impairment is infinite with respect to the disease itself and uncertain with regard to the duration of each episode of a major crisis.

Like the Plaintiff in *Cehrs,* Plaintiff notes that she receives ongoing treatment for her sickle

cell disease.  Plaintiff takes folic acid and multiple vitamins on a daily basis for her sickle cell disease, and her primary care physician, Dr. McClean, has prescribed Darvocet for Plaintiff to take when she feels a sickle cell crisis coming on.  Plaintiff also asserts that she has been prescribed Plavix, HCT2 (hydroshlorothiazide), Amlodipine for hypertension, Metaprolol for angina, and Protonix for hiatial hernia; many of these conditions constitute complications of her sickle cell disease.  Medical records reveal that Plaintiff sees her hematologist, Dr. Varki, on an ongoing basis. Although Dr. Varki's records reflect extended periods of time during which Plaintiff is without significant symptoms, the records also reveal that Plaintiff suffers weakness, weight loss, and shortness of breath.  Finally, Plaintiff indicates that she experiences chronic anemia, her gall bladder has been removed, she has a heart murmur, gout, an enlarged spleen, and elevated bilirubin, all of which she explains are complications of sickle cell disease.  Plaintiff also notes that she had a stroke and continues to suffer from hypertension.

In *Vincent v. Wells Fargo Guard Services, Inc. of Florida*, 3 F. Supp. 2d 1405 (S.D. Fla. 1998), the parties conceded that the plaintiff was disabled for purposes of the ADA because he suffered from sickle cell disease.  Although in that decision Judge Moore did not make a finding of disability, he also did not reject the parties' concession of that element of the plaintiff's ADA claim. Rather, proceeding from the premise that sickle cell disease constitutes a disability under the ADA, Judge Moore noted that the action presented "a unique set of facts" because the plaintiff did not constantly suffer from the effects of his disability.  *Id*. at 1416.  Although the court found that the plaintiff's ADA claim failed because he was not qualified for the job, it did discuss the nature of sickle cell disease.  The court acknowledged that the plaintiff's crises were sporadic and struck with or without warning and with varying degrees of intensity.  In short, *Vincent* provides an example of

34

a case where the court treated sickle cell disease as a disability, despite the sporadic nature of the illness's symptoms. Thus, in an appropriate case, sickle cell disease can constitute a disability under the ADA.

Moreover, the Court finds that whether Plaintiff's sickle cell disease substantially limits her ability to care for herself or work constitutes an issue of fact. In *Harris v. H&W Contracting Co.*, 102 F.3d 516 (11th Cir 1996), a case involving a plaintiff with Graves' disease, the Eleventh Circuit acknowledged that the plaintiff was not required to prove that her Graves' disease constituted a disability under the ADA in order to withstand a motion for summary judgment. Instead, the plaintiff had to show only the existence of a genuine issue of material fact regarding whether her Graves' disease substantially limited a major life activity. *Id.* at 521-22. And while some have read *Bragdon* to imply that a finding of disability is a question of law for the Court to determine, the Eleventh Circuit in *Harris* treated the issue as one of fact, although the Court notes that *Harris* was decided after *Bragdon* and the opinion does not refer to the *Bragdon* decision.

Other circuits, however, have discussed *Bragdon* and have treated the determination of a plaintiff's disability as a question of fact for the jury. *See Weisberg v. Riverside Tp. Bd. of Educ.*, 180 F. App'x 357 (3rd Cir. 2006); *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751 (3rd Cir. 2004); *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479 (7th Cir. 2002); *Bristol v. Board of County Com'rs of County of Clear Creek*, 281 F.3d 1148 (10th Cir. 2002); *Frazier v. Delco Electronics Corp.*, 263 F.3d 663 (7th Cir. 2001); *Hayes v. United Parcel Service, Inc.*, 17 F. App'x 317 (6th Cir. 2001); *Navarro v. Pfizer Corp.*, 261 F.3d 90 (1st Cir. 2001); *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645 (5th Cir. 1999).

District courts within the Eleventh Circuit have recognized *Bragdon* and similarly have

treated the determination of a disability as a question of fact for the jury.  *See Mize v. Centura Financial Services*, 2009 WL 3419586 (S.D. Ala. Oct. 21, 2009); *Irizarry v. Mid Florida Community Services, Inc.*, 2009 WL 2135113 (M.D. Fla. July 14, 2009); *Quitto v. Bay Colony Golf Club, Inc.*, 2007 WL 2002537 (M.D. Fla. July 5, 2007); *Smith v. Quintiles Transnational Corp.*, 509 F. Supp. 2d 1193 (M.D. Fla. 2007); *Richards v. Publix Supermarket, Inc.*, 2007 WL 570090 (M.D. Fla. Feb. 20, 2007).  *See also Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003) (only the first two elements of whether a plaintiff suffers from an actual disability are determined by the court as a matter of law).  This Court agrees with those courts concluding that the issue of whether an impairment substantially limits a major life activity constitutes an issue of fact.

As other courts have noted, the language in *Bragdon* that has led some courts to conclude that determining whether an impairment constitutes a disability is an issue of law is explained by the fact that the Supreme Court was reviewing cross-motions for summary judgment.  Indeed, the *Bristol* Court explained*,* "[I]t is apparent that the Supreme Court in *Bragdon* assumed the "substantially limits" step was factual when it wrote, 'We agree with the District Court and the Court of Appeals that no triable issue of fact impedes a ruling on the question of . . . [whether] Respondent's HIV infection is a physical impairment which substantially limits a major life activity, as the ADA defines it.'"  *Bristol*, 281 F.3d at 1159.

Viewing the record here in the light most favorable to Plaintiff, the Court finds that all of the medical evidence in the record as well as Plaintiff's affidavit explaining how her sickle cell disease affects her on an ongoing basis, provides a sufficient basis for a reasonable jury to conclude that Plaintiff suffers from an impairment that substantially limits the major life activity of caring for herself and, at times, working.

36

### c.      Did Defendant Regard Plaintiff as Being Disabled Under the ADA?

A plaintiff is "regarded as" having a disability if "(1) a covered entity mistakenly believes

that a person has a physical impairment that substantially limits one or more major life activities, or

(2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits

one or more major life activities." *Sutton*, 527 U.S. at 489.  Hence, a person is "regarded as" having

a disability if her employer perceives her as having a disability, even if no factual basis exists for the

perception.  *Richardson v. Honda Manufacturing of Alabama, LLC*, 635 F. Supp. 2d 1261, 1278

(S.D. Ala. 2009) (citing *Carruthers v. BSA Advertising, Inc.,* 357 F.3d 1213, 1216 (11th Cir. 2004)).

"As with actual impairments, however, the perceived impairment must be one that, if real, would

limit substantially a major life activity of the individual."  *Id.*

Because the Court finds that a genuine issue of fact exists whether Plaintiff's impairment

substantially limits her major life activities, it is not necessary for the Court to assess whether

Defendant "regarded' Plaintiff as being disabled.

Finally, in its Motion for Summary Judgment, Defendant does not argue that the remaining

elements of Plaintiff's disability claim prevent her from establishing a *prima facie* case.

Accordingly, the Court proceeds to analyze Plaintiff's claims pertaining to race, national origin, age,

and gender discrimination.

### E.      Establishing a *Prima Facie* Case of Race, National Origin, Age, and Gender Discrimination

Counts IV through XI set forth claims of discrimination based upon race, national origin,

gender, and age pursuant to Title VII, the FCRA, and the ADEA.  Title VII provides that it is an

unlawful employment practice for an employer "to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.  Thus, an employer may not take an adverse employment action against an employee on the basis of that employee's protected status.  The FCRA is patterned after Title VII and, thus, courts have held that decisions construing Title VII are applicable when considering claims under the FCRA.  *Harper v. Blockbuster Entm't Corp.*, 139 F. 3d 1385 (11th Cir. 1998).

Likewise, the ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA applies to individuals who are at least 40 years of age. 29 U.S.C. § 631(a). "Under the ADEA, a plaintiff claiming disparate treatment bears the ultimate burden of proving that age was a determining factor in the employer's decision to fire him or her." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).

In this case, Plaintiff alleges that she was discriminated against in two ways: she was demoted and then ultimately fired.  The parties dispute the elements of the applicable *prima facie* case – Defendant contends that Plaintiff's employment was terminated as a result of a RIF and Plaintiff contends that she was discharged for discriminatory reasons.  In its Motion for Summary Judgment, Defendant also argues that Plaintiff's transfer to Medical Staff was not an adverse action and, therefore, dedicates its discussion of Plaintiff's discrimination claims to her termination. Plaintiff, on the other hand, argues that both her transfer and termination constituted adverse actions and that a reasonable fact finder could find that these actions resulted from discrimination.

38

### 1.      Plaintiff's Transfer to the Medical Staff Unit

With respect to Plaintiff's discrimination claims based on her transfer to the Medical Staffing unit, to prove a *prima facie* case, she must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside her protected class. *Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000). With respect to Plaintiff's claim pursuant to the ADEA, the *prima facie* case is similar – Plaintiff must show that (1) she was a member of a protected group of persons between the ages of 40 and 70, (2) she was subject to an adverse employment action, (3) a substantially younger person filled the position from which she was discharged, and (4) she was qualified to do the job for which she was rejected. *Chapman v. A.I. Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000); *Damon*, 196 F.3d at 1359.

In this case, no dispute exists that Plaintiff was a member of a protected class based upon her race, national origin, age, and gender. Indeed, Plaintiff is a Black female of Jamaican descent and was in her fifties at the time of her transfer. Likewise, it appears that Defendant does not dispute that Plaintiff was qualified for her job. Indeed, because Plaintiff was discharged from a previously held position, she does not need to satisfy the proof-of-qualification prong of the test. *See Young v. General Foods Corp.*, 840 F.2d 825, 830 n.3 (11th Cir. 1988) (citations omitted). Moreover, although Defendant argues that Plaintiff cannot show that she suffered from an adverse action with respect to her transfer, as noted above in section C.1, *supra*, the Court finds that a genuine issue of material fact exists as to whether Plaintiff suffered an adverse employment action when she was transferred from the position of Executive Secretary in the Hospital's Administrative Office to the Medical Staff Office.

Accordingly, the only remaining element that Plaintiff must show to establish a *prima facie* case of discrimination with respect to her transfer is that she was replaced by someone outside of her protected class.  The Court finds that, with respect to her transfer, Plaintiff has set forth enough evidence from which a reasonable trier of fact could conclude that Plaintiff was replaced by someone outside of her protected class.   Here, it is clear that Defendant transferred Cruz into its Administrative Office at the same time that Plaintiff was transferred to Medical Staff.  In fact, Defendant admits that Plaintiff was transferred to Medical Staff because Izquierdo wanted Cruz to transfer into the Administration Office.  Cruz is substantially younger than Plaintiff and is a Hispanic male.  Hence, Cruz belongs to a different race, national origin, and gender, and is younger than Plaintiff.

The relevant question, however, is whether Cruz can be deemed to have "replaced" Plaintiff as Executive Secretary in Administration.  Defendant contends that Plaintiff was not replaced. Instead, Defendant argues that it eliminated Plaintiff's position of Executive Secretary and created a new position with the combined responsibilities of Executive Secretary and physician contracts. Plaintiff, on the other hand, asserts that Defendant essentially swapped Plaintiff and Cruz's positions, with Cruz taking over Plaintiff's position as Executive Secretary with the Hospital with the mere addition of another task to be performed in the job.

The Court finds that a question of fact exists as to whether Cruz replaced Plaintiff.  First, it is significant that the Personnel Action Request (PAR) effectuating the transfer of Cruz out of Medical Staff to the Administrative Office lists the transfer as a change to the position of Executive Secretary.  And, although Defendant added the handling of physician contracts to Cruz's position description, merely adding a responsibility to the position does not necessarily show that the position

of Executive Secretary was eliminated.  Indeed, Cruz performed all other functions of Executive Secretary engaged in by Plaintiff.  Likewise, the Court notes that after Cruz resigned from the Hospital, Defendant ran an advertisement seeking to fill his position.  Under the heading of "position summary," Cruz's position was described as "Executive Secretary."  This information suffices to raise a question of fact with respect to whether Defendant eliminated Plaintiff's position of Executive Secretary or, rather, Cruz replaced Plaintiff when Defendant transferred her to Cruz's former position in Medical Staff.

In conclusion, Plaintiff has met her burden of setting forth a *prima facie* case of discrimination based on her transfer to the Medical Staff Office.  Thus, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for its actions.

### 2.        Plaintiff's Termination

With respect to Plaintiff's discrimination claims based on her termination, the parties dispute whether Plaintiff's termination resulted from a RIF at the Hospital.  On the one hand, Defendant contends that Plaintiff, along with four other employees, was selected by Izquierdo and the Administration for termination as a result of a RIF.  Plaintiff, on the other hand, asserts that the RIF is "a sham and a pretext for discrimination."  *See* D.E. 48 at p. 16.

The dispute between the parties is significant because the determination of whether Plaintiff's termination resulted from a RIF impacts the elements that Plaintiff must set forth to establish her *prima facie* case.  *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1347 (11th Cir. 2000) ("case law suggests that the standard for establishing a prima facie case depends on whether the case concerns a reduction in force as opposed to a termination.") (citation omitted).  With respect to a reduction in force case, a plaintiff must present evidence by which a fact finder might reasonably conclude that

the employer intended to discriminate on the basis of the protected class. *Id.* (citing *Earley v. Champion International Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990)).[15] In a termination case, however, the plaintiff is not required to make such a showing in her *prima facie* case. *Id.* Instead, to establish a discriminatory discharge, a plaintiff can establish a *prima facie* case by showing that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside of the protected class. *Cuddeback v. Florida Board of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). Hence, the elements necessary to establish a discriminatory discharge are the same as those set forth above with respect to Plaintiff's transfer.

After reviewing the evidence in the record, the Court finds that it is unable to classify neatly the type of case at issue. In this regard, a genuine issue of material fact exists as to whether Plaintiff's termination resulted from a RIF or whether, instead, Defendant used the alleged RIF as an explanation to excuse its termination of Plaintiff. First, the Court notes that only five of the Hospital's numerous employees were terminated as a result of the alleged RIF. Additionally, of the five employees terminated, two (*i.e.*, Abe Geyer and Annie Mansfield) had planned on "retiring." Moreover, Defendant offered another employee, Audrey Lanzo, another position with the Hospital,

---

[15]    More specifically, to set forth a *prima facie* case of discrimination in the context of a RIF, the plaintiff must show that she is (1) member of protected class and was discharged, (2) was qualified for her position or another position available at the time of discharge, (3) suffered an adverse employment action, and (4) evidence exists from which a reasonable trier of fact could conclude that the employer intended to discriminate against Plaintiff on the basis of her protected class in reaching its decision. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998).

but she declined.[16]   On the other hand, Plaintiff points out that the Hospital continued to hire

employees at the time of the RIF, as noted by Defendant, these new employees were all hired for

clinical positions.  Hence,  this fact does not necessarily controvert Defendant's stated intention to

reduce non-clinical positions.

More significantly, however, the utilization reports that Defendant alleges support its

decision to eliminate positions in a RIF present a question, at least with respect to Plaintiff's

position.  In the light most favorable to Plaintiff, the reports can be seen to suggest that as of

September 30, 2007, approximately one  month prior to Plaintiff's termination, the Medical Staff

department was not over-staffed.  The reports reveal that the target hours for the department totaled

618 hours and the actual hours used amounted to only 595.25.  Thus, the Medical Staff department

was under its target hours and appears to have been staffed appropriately.  Likewise, the utilization

report for October 31, 2007, shows the target hours for Medical Staff as 662.40, with the actual hours

used at 589.75.  In November of 2007, after Plaintiff's termination, the utilization report indicates

that the target hours for Medical Staff were reduced to 457.60, but other departments in which

Defendant cut positions did not similarly see their target hours lessened.  Instead, for example, in the

X-ray and Ultrasound departments, target hours remained approximately the same, with the

department being able to meet the target because of the elimination of positions.  In contrast, it does

not appear that the Medical Staff department had to eliminate a position to be able to meet its target

hours.

---

[16]     The Court notes that Lanzo was an RN working in an administrative position and
was offered an opportunity to return to an RN position.  Defendant explains that the offer to
return to a clinical position comports with the Hospital's goal to reduce non-clinical positions so
that patient care was not affected.

All of these facts could support a finding by a reasonable jury that, perhaps, Plaintiff's termination did not result from a RIF, but rather, from a simple termination.  At a minimum, a genuine issue of fact exists with regard to this issue. For purposes of the summary judgment motion, the Court takes the facts in the light most favorable to Plaintiff, as it must. Accordingly, in resolving the pending motion, the Court will analyze Plaintiff's claim in the context of a discriminatory discharge.  As noted above, to establish a discriminatory discharge, Plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside of the protected class. *Cuddeback v. Florida Board of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004).

As noted above, Defendant does not dispute that Plaintiff, as a Black female of Jamaican descent in her fifties, was a member of a protected class.  Accordingly, Plaintiff has met the first prong of her *prima facie* case.  Further, Defendant appears to concede that Plaintiff was qualified for her job at the time of her termination.  Moreover, neither party disputes that Plaintiff suffered an adverse employment action.  Indeed, unlike with regard to Plaintiff's transfer, which Defendant argued did not constitute an adverse employment action, both parties agree that Plaintiff's termination meets the third prong of the *prima facie* case.

Finally, pertaining to the last prong of the *prima facie* case, the Court finds that a genuine issue of material fact exists as to whether someone outside of Plaintiff's protected class replaced her, at least with respect to her race, national origin, and age.  In this regard, although the Hospital eliminated Plaintiff's position in the Medical Staff department, it is undisputed that remaining employees (Grana, Evans, Huang, and Vincenne) absorbed the duties of Plaintiff's job. All of these remaining employees were younger than Plaintiff and are white, Asian, or Hispanic.

In *Miller v. Aramark Corp.*, 2004 WL 1781103 at *4 (N.D. Ga. 2004), the court found that the plaintiff made out a *prima facie* case even though the employer in that case divided the plaintiff's job duties among two employees after releasing the employee. The court noted that although the defendant did not "replace" the plaintiff by hiring a new employee, it replaced the plaintiff in the sense that it assigned his duties to two employees, both of whom were substantially younger than the plaintiff. *Id. See also Hidalgo v. Overseas Condado Ins. Agencies, Inc*, 120 F.3d 328, 334 (1st Cir. 1997). Similarly, the Court finds that a genuine issue of material fact exists as to whether Plaintiff can meet the last prong of her *prima facie* case at least with respect to her claims of race, national origin, and age discrimination. The same cannot be said for Plaintiff's claims of gender discrimination because the individuals "replacing" Plaintiff in the Medical Staff department are all women.

Because Plaintiff has made out a *prima facie* case that gives rise to an inference of discrimination with respect to Plaintiff's claims for age, race, and national origin claims, the burden now shifts to Defendant to articulate a non-discriminatory reason for its employment action. The Court, finds, however, that because Plaintiff was "replaced" in her Medical Staff position with other female employees, she cannot make out a *prima facie* case with respect to her gender discrimination claims as they relate to her termination. For this reason, Defendant is entitled to summary judgment on the portions of Counts X and XI that assert claims for gender discrimination based upon Plaintiff's termination.

**F.      Defendant's Alleged Legitimate Business Reasons**

As noted previously, where Plaintiff establishes a *prima facie* case of discrimination or retaliation, the burden shifts to Defendant to come forward with evidence of a legitimate, non-

retaliatory reason for the challenged employment action. *Curtis,* 292 F. App'x at 883 (11th Cir. 2008); *Pennington,* 261 F.3d at 1266 (citing *Olmstead,* 141 F.3d at 1460); *Brown,* 563 F. Supp. 2d at 1378.  This burden is "exceedingly light."  Defendant states that its decision to have Cruz handle the physician contracts as an Executive Secretary in administration is a legitimate, non-discriminatory, and non-retaliatory business reason for transferring Plaintiff to the Medical Staff department.  Likewise, Defendant contends that the RIF constitutes a legitimate, non-discriminatory, and non-retaliatory business reason for terminating Plaintiff's employment with the Hospital.

The Court finds that Defendant's reasons are adequate to satisfy the employer's burden of production, and Plaintiff does not appear to suggest otherwise.  *See Vessels v. Atlanta Independent School System,* 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions).  Because Defendant has met its burden of providing a legitimate, non-retaliatory reason for its actions, under the *McDonnell Douglas* framework, the burden shifts back to Plaintiff to show that Defendant's reasons are merely pretext and the real reason for its decision was discrimination or retaliation.

**G.    Pretext**

In order to create a genuine issue of material fact on the question of pretext, Plaintiff must demonstrate that Defendant's proffered legitimate business reason was not the real reason for the employment decision.  *Jackson v. State of Alabama State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir. 2005).  In other words, a plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."  *Combs v. Plantation Patterns,* 106

F.3d 1519, 1538 (11th Cir. 1997) (citations omitted).  Plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*  In the latter approach, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds*.

A review of the record reveals evidence that would potentially allow a factfinder to disbelieve Defendant's proffered explanation for its actions.  First, with respect to Plaintiff's transfer, as noted previously, the memorandum transferring Plaintiff out of her position of Executive Secretary in Administration to the Medical Staff department came directly on the heels of a major sickle cell crisis during which Plaintiff took FMLA leave due to her hospitalization.  More specifically, Plaintiff returned from FMLA leave on January 15, 2007, and contends that Izquierdo approached her about the transfer only two weeks later.  The Hospital's records reveal that the transfer became effective on February 4, 2007.  This short time frame raises a question as to what Izquierdo's motives were in choosing Plaintiff to transfer to Medical Staffing.

Further, although Defendant claims that transferring Plaintiff to Medical Staff came as a result of Izquierdo's desire to have physician contracts handled in Administration, this fact alone does not explain why Izquierdo selected Plaintiff to transfer out of Administration.  The record reflects that prior to Izquierdo's appointment as the CFO, Plaintiff's co-worker Johnsen handled physician contracts.  Hence, if Izquierdo wanted the physician contracts to be handled in Administration, she could have assigned this task to Johnsen and avoided transferring Plaintiff out

of the department.  Likewise, Plaintiff testified that earlier in her career, she handled physician contracts, including preparing and auditing the contracts.  Despite these facts, Izquierdo did not select Johnsen to take over the contract work and Izquierdo admits that she never considered whether Plaintiff could remain in her position and perform the physician contract work as part of her duties as Executive Secretary.  As for Cruz, even if Izquierdo wanted him to continue handling the physician contracts, his office was close to the Administrative Office and a short walk away.

Moreover, in her deposition testimony, Izquierdo admitted that over her career, she has hired a substantial number of Hispanic individuals to work under her supervision.  Indeed, the significant majority of individuals Izquierdo has hired are of Hispanic descent.  While, in itself, of course, there is nothing wrong with this fact, in the context of a case for race and national origin discrimination, it does at least create an issue of material fact as to the reasons for Izquierdo's hiring decisions. Additionally, even after Izquierdo left the Hospital, she hired Cruz for yet another position. Although the evidence could show that all of the individuals hired by Izquierdo were, in fact, the most qualified for their positions, a reasonable jury could find based on her hiring tendencies, these facts at least create a material issue of fact as to whether Izquierdo discriminated against Plaintiff because she was not Hispanic.  The information could also suggest that Izquierdo selected Cruz to "replace" Plaintiff because he was Hispanic.

Furthermore, the record demonstrates that Izquierdo made the decision to transfer Plaintiff to the Medical Staff department without consulting with the supervisors in that department.  Also significant to the issue of pretext is the fact that in her twelve-year tenure with the Hospital, Plaintiff had received good performance reviews.  When Izquierdo took over as CFO and after Plaintiff's transfer to Medical Staff, however, Plaintiff received a negative performance evaluation for the first

time.  With respect to the performance evaluation, Plaintiff revealed that Rodriguez confided in Plaintiff that she was told to "find stuff" to write about Plaintiff.

It is also significant that Izquierdo, the same decision-maker with respect to Plaintiff's transfer out of the Administrative Office, was directly involved in the decision to terminate Plaintiff. Hence, if Izquierdo had a bias against Plaintiff with respect to her transfer because she was not Hispanic, this bias could carry over to the termination process.  The Court also notes that following Plaintiff's negative performance evaluation, Bittner told Plaintiff that if she was unhappy with the transfer, she could simply accept a severance package and leave the Hospital.  This action could be seen as an attempt by the Hospital to force Plaintiff to resign on her own.

Additionally, and as noted previously, Plaintiff disputes that her termination was part of a RIF.  Indeed, Plaintiff points out that of the five employees terminated, two planned on retiring. Defendant also offered another employee another position with the Hospital, but she declined.  More significantly, the utilization reports that Defendant alleges support its decision to eliminate positions in a RIF present a question as to the Hospital's motives, at least with respect to Plaintiff.  The reports can be viewed as suggesting that prior to Plaintiff's termination, the Medical Staff department was not over-staffed.  The reports reveal that the Medical Staff department was under its target hours and appears to have been staffed appropriately.  However, after Plaintiff's termination, the utilization reports indicate that the target hours for Medical Staff were reduced to 457.60, but other departments in which Defendant reduced positions did not similarly reduce target hours.  Hence, a jury could find that the Hospital did not have to eliminate a position in the Medical Staff department in order to meet its target hours and that Defendant's explanation of Plaintiff's termination was merely pretextual.

Plaintiff also points out that despite the fact that Bittner claims that the individuals selected

for termination were reviewed for discrimination purposes, the individuals were mostly older employees, who had taken FMLA leave and who were Black.  In this regard, four of the five individuals selected for termination were over the age of forty.  Likewise, four of the individuals had taken FMLA leave on more than one occasion in the two years prior to their termination.  Finally, three of the individuals terminated were Black, but none were Hispanic.  Although these numbers, in and of themselves, do not necessarily indicate that Defendant discriminated against Plaintiff due to her race, national origin, and age, a jury could find that they, along with other evidence, support a finding of pretext.

Finally, it is worth noting that Plaintiff's supervisor, Rodriguez, did not attend the meeting to terminate Plaintiff because she was "not comfortable" with doing so.  Additionally, following Plaintiff's termination, after Cruz left to join Izquierdo at his new employment, the position of Executive Secretary in Administration became available.  Despite Bittner's advising Plaintiff that her "record will reflect that your termination is due to position elimination and that you are eligible for rehire," the Hospital did not contact Plaintiff to determine whether she was interested in returning to the Hospital.  This fact is significant in light of the fact that Cruz left his employment with the Hospital on December 19, 2007, only two months after Plaintiff was terminated.

Upon careful review of the summary judgment record, and construing the facts in the light most favorable to Plaintiff, an issue of fact remains concerning whether Defendant was motivated by the proffered legitimate reasons for transferring Plaintiff to the Medical Staff department and ultimately terminating her employment with the Hospital with respect to Plaintiff's race, age, and national origin claims.  Typically, a plaintiff who establishes a *prima facie* case and has set forth sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its

actions, creates a jury issue and, hence, a plaintiff will prevail over a defendant's motion for summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 140 (2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997)).

With regard to Plaintiff's claim that her transfer to Medical Staff was due to her gender, however, the Court does not conclude that a genuine issue of material fact exists that Defendant's reasons were pretextual and the real reason for the transfer was Plaintiff's gender. Indeed, Plaintiff points only to the fact that Cruz, as a male, "replaced" Plaintiff as Executive Secretary. Plaintiff has not set forth any other evidence that suggests that her transfer was motivated by discriminatory animus because she is female.[17] This raises no issue of fact with regard to pretext as it relates to Plaintiff's claim of discrimination based on her gender. In the absence of evidence favorable to Plaintiff on the issue of pretext, Plaintiff's claim for gender discrimination must fall.

For these reasons, the Court must deny Defendant's Motion for Summary Judgment with respect to all of Plaintiff's claims except Plaintiff's claims for gender discrimination.[18]

---

[17]    As noted above, Plaintiff has not established a *prima facie* case of gender discrimination with respect to her termination because the employees who took over her job responsibilities were also female.

[18]    The Court recognizes that if Plaintiff is able to demonstrate that Defendant's proffered legitimate reasons are pretextual, Defendant may prevail by establishing a mixed-motive defense. *See Pennington*, 261 F.3d at 1269. To prevail on this defense and avoid liability for Title VII retaliation, an employer must prove "by a preponderance of the evidence that the decision would have been made the same in the absence of discrimination." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1075 (11th Cir. 2003); *Pennington*, 261 F.3d at 1269. The Court need not address the mixed-motive defense at this point however, because it finds that genuine issues of material fact exist which require the case to be presented to a jury.

## *CONCLUSION*

_____Accordingly, for the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [D.E. 31, 32] is hereby **GRANTED IN PART AND DENIED IN PART.**  Defendant's Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's gender discrimination claims set forth in Counts X and XI.  Defendant's Motion for Summary Judgment is **DENIED** with respect to all other counts.

  **DONE** and **ORDERED** at Fort Lauderdale, Florida this 30th day of March, 2010.


         _____

         ROBIN S. ROSENBAUM

         United States Magistrate Judge


cc: counsel of record